Argued August 3, decided August 17, 1909.

## STATE v. WALSWORTH.

[103 Pac. 516.]

HOMICIDE—DEFENSE OF RELATIVE—INSTRUCTIONS.

1. Defendants, father and son, were indicted for murder. The son, who fired the fatal shot, testified that, after his father had held up his hands in token of submission, deceased and his relatives continued shooting into the house where the son found his father wounded and covered with blood, and, believing that his mother was also in the house, he picked up his father's rifle and fired the fatal shot, believing his own life and that of his mother to be in danger. *Held*, that the court's failure to charge on the son's right to protect his mother from danger from an alleged unjustifiable attack on the house by deceased and his brother, was error.

HOMICIDE—DEFENSE OF RELATIVE.

2. Where one of the defendants honestly believed that his mother was in the house when deceased continued to shoot at or into the house without apparent necessity, defendant was entitled to act on appearances, and if the circumstances were such as would have led a reasonably prudent man to believe, and he did believe, that his mother's life was in danger, he was entitled to shoot in her defense.

HOMICIDE—EVIDENCE—THREATS.

3. Where a killing is not deliberate and not in cool blood, previous threats made by one defendant are not evidence against a codefendant who had no knowledge thereof.

CRIMINAL LAW—INSTRUCTIONS—THREATS.

4. Defendants' requested instruction, that evidence of threats against decedent's family could not be considered as against one of the defendants not shown to have had any knowledge thereof, was properly refused, where it further stated that, if the jury were satisfied from the evidence as to which party commenced the affray, they could not consider the evidence of threats as against either defendant; the court not being authorized to charge that, if one item of relevant evidence satisfies the jury's mind on a given point, another item on the same point may be rejected.

From Jackson: HIERO K. HANNA, Judge.

Statement by MR. JUSTICE MCBRIDE.

The defendants, Charles H. Walsworth and Norval Walsworth, were jointly informed against at the March term, 1908, of the circuit court of Jackson County, Oregon, for the crime of murder in the first degree, alleged to have been committed upon the person of James F. Mankin. They were jointly tried, and a verdict of guilty of murder in the second degree was rendered by the jury against each of them. Following this verdict they were sentenced to a term in the penitentiary for the period of their natural lives, and it is from this

judgment of conviction and sentence that they prosecute
this appeal.

The State's testimony tended to show that defendants,
Charles H. Walsworth and Norval Walsworth, are father
and son, and that James F. Mankin, Henry Mankin and
Carroll Mankin are brothers, and owned a small house,
situated near the one in which they resided, and this
house was occupied at the time of the homicide by the
defendant Charles H. Walsworth and his family, con-
sisting of the defendants and Elizabeth Walsworth, the
wife of defendant, Charles H. Walsworth.  On the day
of the homicide, Henry Mankin came to the place where
defendants were, for the purpose of serving upon the
defendant, Charles H. Walsworth, a notice to quit the
premises then occupied by him.  The bill of exceptions
shows that he went about his errand in a peaceable
manner, and politely tendered the notice to quit to the
defendant, Charles H. Walsworth. Thereupon this defend-
ant engaged in a dispute with the said Henry Mankin
and made an indecent remark to him in regard to the
service of the paper.  Thereupon the said defendant
Walsworth drew a pitchfork in threatening manner, and
with this instrument he then threatened Henry Mankin.
At this point Henry Mankin picked up a club, and, while
these two men were facing and cursing each other, Car-
roll Mankin approached the scene, carrying in his hand a
walking stick, which he was using as a cane.  Whereupon
the defendant, Charles H. Walsworth cried: "Its guns,
guns you sons of bitches want, is it?" and ran to the
house carrying his pitchfork with him.  As soon as
defendant, Charles H. Walsworth, started for the house,
defendants, Norval Walsworth, Bert Illingsworth, and
Henry Mankin all called out to Charles H. Walsworth that
said Carroll Mankin had no gun, but that it was a stick.
There is no evidence in the bill of exceptions to dispute
the above statement.

The evidence of the State tends to show that at this time Henry Mankin, Bert Illingsworth, and Carroll Mankin were all unarmed, and none were armed until after defendant, Charles H. Walsworth, had fired the first shot. Norval Walsworth ran after his father and followed him into the house. The defendant, Charles H. Walsworth, then appeared in the doorway and fired a shot from a rifle at Henry Mankin and James F. Mankin, who had just come unarmed upon the scene. At this point in the conflict, Belle Mankin, a sister of Henry, brought out from the Mankin house, first a shotgun, and then a rifle; the shotgun being delivered to James F. Mankin and the rifle to Henry Mankin. Before the guns were delivered to either of said persons, the defendant, Charles H. Walsworth, again fired a gun at said Henry Mankin and James F. Mankin. During all of this time, defendant, Norval Walsworth, remained in said house, and after the second shot was fired by his father he ran from the house and hid behind a corner thereof, from which point he presented a rifle at said James F. Mankin. Whereupon James F. Mankin fired two shots, one at defendant Charles H. Walsworth, and one at defendant, Norval Walsworth, and at the same time that these two shots were fired, and coincident therewith, Norval Walworth fired a shot at James F. Mankin with a gun, and the undisputed evidence shows that this was the shot that killed James F. Mankin on the date named in the indictment and within Jackson County, Oregon. The shot fired by James F. Mankin at Norval Walsworth, wounded the said Norval Walsworth in the face.

The evidence of the State tended to show that, after the shooting was all over, the witness Floyd Dyer went to the front door of the Walsworth house and found defendant, Charles H. Walsworth, lying wounded in the doorway with a 38-caliber Winchester rifle lying by his side. The evidence of the State further tended to show that Norval Walsworth fired the shot the killed James

F. Mankin with a 32-40 caliber Marlin rifle, and this was the same gun with which the defendant, Charles H. Walsworth, fired the first shot. The evidence of the State further tended to show: That, after James F. Mankin was killed, his brother, Henry Mankin, went to the door of the house in which the defendant, Charles H. Walsworth, was; that both men were armed with guns and faced each other and presented said guns at each other; that thereupon Henry Mankin fired, and said shot took effect and wounded Charles H. Walsworth in the head. The evidence of the State further tended to show that, after the shooting was over, defendants and each of them told the arresting officer, upon separate occasions, that they had each killed the deceased, James F. Mankin. The evidence of the State further shows that, on the day prior to the homicide, the defendant, Charles H. Walsworth, had made divers and sundry threats to do great bodily injury and harm to members of the Mankin family, and James F. Mankin, and Henry Mankin. There was no evidence to show that Norval Walsworth was ever present when such threats were made, or knew of their being made, but defendant, Norval Walsworth, while on the stand, testified to nothing concerning these threats or his knowledge thereof.

To rebut this evidence, defendants testified in their own behalf: That, when James F. Mankin came upon the premises where the defendants were, the said defendant, Charles H. Walsworth, went to the house, about 40 yards, where he met the Mankins, and came to the door with a rifle, and, while standing in the door, said gun was accidentally discharged. That when the same was discharged the defendant went into the house and laid the gun on the bed and came to the door of the house and held up his hands, as a token of submission, and requested James F. Mankin not to shoot. At that moment he was fired upon by James F. Mankin, with a shotgun, the shot from which wounded the said Charles

H. Walsworth. That he returned to the house and sat down, and while in the house Norval Walsworth entered the house and found his father wounded and covered with blood, and he procured the rifle his father had laid on the bed and went out of the back door of the house. That when he appeared at the corner of said house he was fired upon by James F. Mankin, at a distance of about 30 yards, and at the same time he fired the shot which killed James F. Mankin. The defendants further offered testimony to the effect that Elizabeth Walsworth, the wife of Charles H. Walsworth, and mother of Norval Walsworth, at the very beginning of the affray, left the house, being the scene of the homicide, and went to the home of a neighbor, some distance away, and it was from there she heard the first shot fired; but her son, Norval, testified that during the affray he believed his mother to be in the house, and that he fired the shot which killed James F. Mankin, because he believed his mother's life was in danger for the reason that James F. Mankin and Henry Mankin were shooting at said house and into the same.          REVERSED.

For appellants there was a brief over the names of *Mr. Robert G. Smith, Mr. E. E. Kelly,* and *Mr. H. L. De Armond,* with an oral argument by *Mr. Smith.*

For the State there was a brief over the names of *Mr. B. F. Mulkey,* District Attorney, *Mr. Andrew M. Crawford,* Attorney-General, and *Messrs. Colvig & Reames,* with an oral argument by *Mr. Clarence L. Reames.*

MR. JUSTICE MCBRIDE delivered the opinion of the court.

1. As will appear by the foregoing statement, the testimony on the trial was very conflicting. It is such as to leave little doubt that defendant, Charles H. Walsworth, originally began the affray which finally terminated in the death of James F. Mankin. There was some testimony, however, tending to show that after Charles

H. Walsworth had ceased from the affray and gone into the house, and thereafter returned to the door and held up his hands in token of submission, the deceased and his relatives followed up the conflict and continued firing. The whole of the testimony in detail is not before us; but the bill of exceptions shows that there was enough along the line above indicated to be submitted to a jury, and that it was, in fact, submitted to them with very careful and correct instructions as to its bearing on the case. The testimony of Norval Walsworth was: That, after the alleged renewal of the conflict by deceased and his relatives, he went into the house and found his father wounded and covered with blood, and his rifle lying on the bed; that at said time he supposed his mother was in the house; that he picked up his father's rifle and went out of the door believing his own life and his mother's to be in danger from deceased and his relatives, who, as he claimed, were firing at and into the house; that at the time he fired the fatal shot he believed his own life and his mother's to be in danger. There is nothing in the bill of exceptions that indicates any disposition on the part of Norval Walsworth to begin an affray with deceased and his relatives; but, on the contrary, as shown by the bill of exceptions, he was one of the parties who strove to allay Charles H. Walsworth's anger, or fear, by calling out to him that Carroll Mankin had no gun, but only a cane in his hand.

2. The charge of the court admirably stated the issues to the jury, and the general charge upon the law of self-defense, so far as it related to the right of Norval and Charles H. Walsworth to defend themselves, is a model charge; but the court entirely omitted to charge the jury upon the right of defendant, Norval Walsworth, to protect his mother from danger to her life from an alleged unjustifiable attack upon the house by deceased and his brother. If, as claimed by Norval Walsworth, his father had withdrawn from the conflict and made his submis-

sion, and after that the deceased followed up the conflict without any necessity, or apparent necessity, for so doing, and continued to shoot at or into the house where the mother of Norval was believed by him to have been at the time, he had a right to act upon appearances, and if he honestly believed that his mother was in the house; and the circumstances were such as would have led a reasonably prudent man to so believe, and at the same time the circumstances were such as induced in his mind a reasonable, honest belief that her life was in danger from a felonious and unnecessary attack by deceased upon the house, he had a right to shoot in her defense, and the refusal to so instruct the jury was error.

3. The request of the defendants for an instruction that evidence of threats against the Mankin family should not be considered as against Norval Walsworth, would have been good law if it had been confined simply to that proposition. There is no doubt that where the killing is indeliberate, and not in cool blood, previous threats made by one defendant are not evidence against a co-defendant who had no knowledge of them.

4. The requested instruction tendered by defendant went further than this, and asked the court to instruct the jury that if they were satisfied from the evidence of those who witnessed the affray, as to which party commenced it, they should not consider the evidence of threats as against either defendant. We do not understand that it is the province of the court to instruct a jury that, if one item of relevant evidence satisfies their mind upon a given point, another item of relevant evidence upon the same point should be rejected. The request was loaded down with a palpable error, and the court was not bound to give it.

Other instructions of the court are challenged in the defendants' brief; but the criticisms are, we think, merely verbal.

Taking the charge as a whole, we think the learned and venerable jurist who presided at the trial stated the

law clearly and correctly, except for the omission hereto-
fore adverted to; but, for that error, which appears to
be a substantial one, the cause must be reversed, and
a new trial granted.          REVERSED.